UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-80748-CIV-MATTHEWMAN

IDANIA VALIENTE GONZALEZ,

    Plaintiff,

v.

NANCY A. BERRYHILL,
Commissioner of Social Security,

    Defendant.

_____/



FILED by _____ D.C.

SEP 1 0 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## <u>ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 24, 25]</u>

THIS CAUSE is before the Court upon Plaintiff, Idania Valiente Gonzalez's ("Plaintiff") *pro se* [1] Motion for Summary Judgment [DE 24], and Defendant, Nancy A. Berryhill, Commissioner of Social Security Administration's ("Defendant") Motion for Summary Judgment [DE 25]. The issue before the Court is whether the record contains substantial evidence to support the denial of benefits to the Plaintiff and whether the correct legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

---

[1] On January 31, 2018, Plaintiff filed a Motion for Extension of Time to File Motion for Summary Judgment and to Appoint Counsel [DE 18]. The Court entered an Order Granting Plaintiff's Motion for Extension of Time and Denying Plaintiff's Motion to Appoint Counsel and Referring This Matter to the Court's Volunteer Attorney Program [DE 19]. Unfortunately, no attorney volunteered to accept Plaintiff's case. Therefore, she filed her Motion for Summary Judgment *pro se*.

# I. <u>FACTS</u>

On November 7, 2013, Plaintiff filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income, asserting a disability on-set date of November 1, 2010. [R. 36].[2] The claims were denied initially and upon reconsideration. *Id.* Following a video hearing on September 16, 2015, the ALJ issued a decision on November 17, 2015, denying Plaintiff's request for benefits. [R. 36-48]. A request for review was filed with the Appeals Council and denied on October 14, 2016. [R. 18-20].

## A. Hearing Testimony

The ALJ held a video hearing on September 16, 2015. [R. 56]. Plaintiff testified that she was born on August 10, 1968, so she was 47 at the time of the hearing. [R. 60]. She is married with two children. [R. 60-61]. Plaintiff's driver's license was suspended two years prior because she did not have automobile insurance. [R. 61]. Plaintiff completed twelfth grade. *Id.* She last worked on November 10, 2010, because of her medical condition and because she no longer had long-term disability through her employer. *Id.* Plaintiff's last job was as a clerk typist, primarily performing clerical duties in an office. [R. 62].

Plaintiff explained that she began having difficulty working because she suffered from migraine headaches, and the left side of her body would go numb when she sat for too long. [R. 62]. Later on, she had problems with depression. *Id.* Plaintiff began working reduced hours. *Id.* She eventually had to stop working because she was not sleeping at night and had no energy during the day. [R. 62-63]. Medication helped sometimes. [R. 63]. Plaintiff also stated that she was not capable of work anymore because she felt uncomfortable being around people. *Id.*

---

[2] All references are to the record of the administrative proceeding filed by the Commissioner at Docket Entry 10.

Plaintiff stated that she was seeing Dr. Sahadeo on a regular basis and that she was taking several medications each day. [R. 63]. Plaintiff stopped taking Adderall because she could not afford the $20 urine test that was required for a prescription refill. [R. 64]. Plaintiff takes Effecter, which does "some things" for Plaintiff. *Id.* She feels like the medicine is no longer working as well. *Id.* Plaintiff's doctor put her on a new anti-depressant two months prior because she was having new symptoms, including thoughts of suicide. [R. 64-65]. Plaintiff's medications make her feel "sometimes very fast and sometimes very slow" and increase her appetite. [R. 65]. Plaintiff does not receive therapy for any mental condition. *Id.*

Plaintiff stated that she is in pain. [R. 66]. Her stomach hurts constantly, and sometimes the left side of her waist hurts. *Id.* She can sit for 10 minutes before her left leg goes numb. [R. 66-67]. Most of the time, Plaintiff lies on the sofa. [R. 66]. Plaintiff can stand for approximately 20 minutes at a time. [R. 67]. She can lift approximately five pounds. *Id.* Plaintiff has problems with her short-term memory and has to write things down because she is very forgetful. *Id.* Plaintiff also has difficulty maintaining attention or concentration and has problems understanding information or instructions. [R. 67-68]. She can "kind of" follow directions. [R. 68].

Plaintiff testified that she helps her husband cook and does small amounts of mopping, but that she does not do the dishes, vacuum, do yard work, pay the bills, clean, do laundry, or take out the trash. [R. 69-70]. She accompanies her husband to the grocery store. [R. 70]. Plaintiff cannot pay bills because she cannot concentrate. *Id.* Plaintiff does not participate in any social activities or leave her house for things other than doctor's appointments. [R. 73].

Plaintiff explained that she would disappoint any future employer because she does not remember basic computer, fax, and copier skills that she used to know. [R. 71]. Plaintiff also

stated that she would not be a good employee because of her short-term memory problems and medical problems. *Id.* She explained that, even when she worked part-time in the past, she missed at least two or three days of work per week. [R. 72]. Plaintiff stated that she would miss work more than once a week now. *Id.*

Plaintiff still suffers from migraine headaches. [R. 73]. According to Plaintiff, she was diagnosed with multiple sclerosis at one point, but it turned out to be fibromyalgia rather than multiple sclerosis. *Id.* Plaintiff also testified that she has rapid cell growth syndrome in her brain, which produces the numbness and pain on the left side of her body. *Id.*

Elizabeth Laplante, the vocational expert, testified at the hearing. [R. 74]. The ALJ first posed a hypothetical in which an individual of the same age, education, and work experience as Plaintiff could work at a light exertion level, but could only occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes or scaffolds; should avoid concentrated exposure to extreme heat, excessive noise, vibration, environmental irritants, and hazards such as unprotected heights and dangerous machinery; could perform simple, routine tasks; could maintain attention and concentration for simple tasks with customary breaks; and could have occasional superficial contact with co-workers, supervisors, and the public. [R. 74]. The vocational expert explained that such an individual could not perform any of Plaintiff's past work. *Id.* She stated that such an individual could, however, perform the jobs of price marker, laundry classifier, and mailroom clerk. *Id.*

The ALJ posed a second hypothetical in which an individual had the same limitations stated before except the exertional level was changed from light to sedentary. [R. 76]. The vocational expert testified that such an individual could perform the jobs of call out operator, telephone information clerk, and document preparer. *Id.*

4

The ALJ then posed a third hypothetical in which an individual had the same limitations from the first hypothetical, except that the individual also would be off task about 20 percent of the workday and would miss three or more days of work per month. [R. 77]. The vocational expert testified that this would preclude all work. *Id.*

Plaintiff's counsel then posed a hypothetical in which an individual of Plaintiff's age, educational background, and vocational background experience could work at a light or sedentary exertion level, but could only occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes or scaffolds; should avoid concentrated exposure to extreme heat, excessive noise, vibration, environmental irritants, and hazards such as unprotected heights and dangerous machinery; and was markedly limited in her ability to remember locations and work-like procedures, remember, understand, carry out both one and two-step directions, carry out detailed instructions, maintain attention and concentration, perform activities within a schedule and consistently be punctual, sustain ordinary routine, work in coordination with others, make simple work-related decisions, complete a normal workday, perform at a consistent pace without unnecessary rest periods, accept instructions and respond to criticism from supervisors, get along with co-workers, maintain socially appropriate behavior, respond appropriately to changes, set realistic goals, and make plans independently. [R. 77-78]. The vocational expert responded that such an individual would not have any jobs available to her. [R. 78].

The vocational expert also stated that her testimony was in accordance with the DOT[3]. [R. 78].

### B. Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits, the ALJ reviewed the medical

---

[3] Dictionary of Occupational Titles

evidence of record, the relevant portion of which is summarized chronologically below. The Court is not summarizing Plaintiff's medical records which pertain to minor or irrelevant illnesses.

Plaintiff presented to Dr. Dennis Feinrider on December 3, 2009, for an initial evaluation and neurological assessment. [R. 426]. The neurological examination was normal. [R. 427]. Dr. Feinrider noted that the "MRI questions the possibility of a demyelinating process, although I suspect that it would be more migrainous. The patient has no upper motor neuron findings on examination." *Id.* The doctor concluded that Plaintiff suffered from "a level" of depression and stress and recommended that, for those issues, and for Plaintiff's headache management, she take Trazodone. *Id.* Plaintiff saw Dr. Feinrider for a follow-up on December 23, 2009. [R. 425]. The doctor found that it was very unlikely that Plaintiff had multiple sclerosis. *Id.* He noted that Plaintiff had taken Trazodone for only two days, and never notified his office that she had stopped taking it. *Id.* Dr. Feinrider determined that Plaintiff's symptoms were multifactorial, suggested she see a mental health counselor, and switched her medication to Pamelor. *Id.*

In 2011, Plaintiff presented to Agresti and Associates multiple times. [R. 640-648]. However, the records are illegible.

Plaintiff presented to Dr. Jose Zuniga on December 9, 2011, complaining of headaches, anxiety, depression, and REM behavior disorder. [R. 447]. Plaintiff reported that her severe migraines had improved, but that she continued to suffer from anxiety, difficulty sleeping, and depressed mood. *Id.* Plaintiff had not been able to see her psychiatrist for a few months because he was moving his office. *Id.* Dr. Zuniga increased Plaintiff's Citalopram dosage until she could see her psychiatrist. *Id.* Dr. Zuniga noted that Plaintiff was taking medications for her migraines. *Id.* He also noted that, because of her REM behavioral disorder, Plaintiff needed Clonazepam, but that she was also using the medication to alleviate her anxiety. *Id.* Plaintiff's

physical examination was normal except for mild decreased sensation in the distribution of the median nerve in the upper extremities. [R. 447-48]. Dr. Zuniga diagnosed Plaintiff with migraine (common intractable), REM sleep behavior disorder, cerviobrachial syndrome (diffuse), depressive disorder, and dizziness and giddiness. [R. 448]. He asked Plaintiff to follow up with her psychiatrist in six weeks due to her persistent symptoms of depression and recommended aquatic therapy for her neck pain. *Id.*

Plaintiff presented to Dr. Zuniga on June 28, 2012, for her migraines, memory loss, and carpal tunnel. [R. 444]. She reported that her severe migraines had improved, but that she still suffered from anxiety, difficulty sleeping, and depressed mood. *Id.* She stated that she was still on medication, which did help her depression, but that she had not been able to see her psychiatrist. *Id.* Plaintiff complained of difficulty with her left arm—mainly numbness and tremor. *Id.* Plaintiff was still taking medication for her migraines, REM behavioral disorder, and anxiety. *Id.* Plaintiff's physical examination was normal except for mild decreased sensation in the distribution of the median nerve in the upper extremities. [R. 444-45]. Dr. Zuniga explained that, if Plaintiff continued to have difficulty with her left arm, she would need diagnostic studies at her next visit. [R. 445]. He also ordered an EMG muscle test for Plaintiff's limbs. *Id.*

On December 17, 2013, Plaintiff completed a Supplemental Pain Questionnaire, stating that she experienced pain daily. [R. 323-25]. On the same date, she also completed a Function Report [R. 326-33].

Plaintiff saw a dermatologist, Dr. Josh Berlin, from August 17, 2011, to June 5, 2013. [R. 453-71]. It appears that she suffers from a minor skin condition, but the doctor's notes and records are illegible. On June 7, 2013, after Plaintiff had a skin biopsy of her left wrist, it was determined that Plaintiff had chronic hypertronic (psoriasiform) dermatitis. [R. 450].

On September 4, 2013, Plaintiff presented to the emergency department at JFK Medical Center complaining of a rash she had had for two weeks. [R. 472]. She was diagnosed with contact dermatitis and a fungus infection of the skin and discharged. [R. 479].

On November 5, 2013, Plaintiff presented to Dr. Womesh Sahadeo of the Palm Beach Psychiatric and Addiction Center. [R. 483-85]. The doctor's notes are illegible. On January 9, 2014, Plaintiff again presented to Dr. Sahadeo. [R. 482, 485]. The doctor's notes are generally illegible, but Dr. Sahadeo did find that Plaintiff did not suffer from continued psychosis, suicidal or homicidal ideation, or hallucinations. [R. 482]. Dr. Sahadeo also found that Plaintiff had fair impulse control, dysphoric mood, blunted affect, normal speech, organized thought process, fair insight and judgment, fair eye contact, and fair hygiene. *Id.*

In the Disability Determination Explanations at the Initial Level dated January 30, 2014, it was determined that Plaintiff suffered from the following severe impairments: fibromyalgia, anxiety disorders, and affective disorders. [R. 84]. Maurice Rudmann, Ph.D., found that Plaintiff had moderate difficult in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration. [R. 85]. Dr. Rudmann also found that the evidence did not establish the presence of "C" criteria. *Id.* He determined that Plaintiff was only partially credible because the medical evidence did not support her allegations. [R. 86]. Dr. Rudmann concluded that Plaintiff is moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to interact appropriately with the general public, and the ability to respond appropriately to changes in the work setting. [R. 86-88]. The State disability adjudicator/examiner, Lonnie Milburn, determined that Plaintiff is not disabled. [R. 90].

8

On March 7, 2014, Plaintiff completed a second Supplemental Pain Questionnaire, stating that she experienced pain all of the time. [R. 349-51]. On March 8, 2014, she also completed a Function Report [R. 352-65].

On April 15, 2014, Dr. Steven L. Kanner completed an examination of Plaintiff upon a referral from the State of Florida Office of Disability Determinations. [R. 512]. Plaintiff reported that she could not work because she suffered from rapid cell growth syndrome, severe migraine headaches, blurred vision, numbness on the left side of her body, extreme anxiety and depression with suicidal thoughts, insomnia, and panic attacks that caused pinching in her chest. *Id.* Plaintiff also stated that she suffered from dizziness and had to use a cane at times. *Id.* Plaintiff additionally reported lower back pain and foot pain and said that she could only sit or stand for five to 15 minutes. *Id.*

Dr. Kanner examined Plaintiff. [R. 513-14]. He opined that Plaintiff has pain in her lower back, but no motor reflex or sensory deficits. [R. 514]. Dr. Kanner noted that Plaintiff ambulated easily without assistive devices and did not appear to be off balance. *Id.* He also noted that Plaintiff demonstrated no overt psychiatric dysfunction during the interview. *Id.* Dr. Kanner pointed out that, while Plaintiff reported that the left side of her body was numb because of rapid cell growth syndrome, Plaintiff's neuromuscular examination was within normal limits. *Id.* Finally, he noted that Plaintiff had no difficulty with normal conversational speech. *Id.* Dr. Kanner opined that Plaintiff could sit, stand, walk, lift, carry, and handle objects without difficulty, that Plaintiff's hearing and speech were excellent, that her memory was intact, and that she interacted well during the interview. *Id.*

On April 22, 2014, Dr. Ronald L. Seifer, a licensed psychologist, completed a general clinical evaluation with mental status of Plaintiff. [R. 516]. Dr. Seifer noted that he questioned

Plaintiff's reliability because there was a "possible dissimulating component to her presentation." *Id.* He also noted that Plaintiff had a "complex presentation." *Id.* Dr. Seifer found that Plaintiff was purposefully inappropriately answering his questions. [R. 518]. He screened Plaintiff with the Rey Visual Memory Test, and Plaintiff obtained a 7/14. *Id.* Dr. Seifer opined that Plaintiff's score evidenced a "dissimulating visual memory record." *Id.* The doctor concluded that Plaintiff's complex presentation may be due to the adverse effects of medication, a dissimulating component, possible language differences, and possible bona fide mental health difficulties. *Id.* Dr. Seifer found that Plaintiff's prognosis could be improved with mental health treatment, family therapy and medication regimen review. [R. 519]. He was unable to determine Plaintiff's functional limitations. *Id.*

In a Disability Determination Explanation at the Reconsideration Level dated May 8, 2014, Dr. Minal Kirshnamurthy determined that Plaintiff's migraines were stable with medication; that she could sit, stand, walk, lift and carry without difficulty; that there was no evidence of diagnosis for multiple sclerosis; and that Plaintiff's impairments do not result in function loss and are therefore not severe. [R. 114]. Steven Wise, Ph.D., determined that Plaintiff suffered from affective disorders and anxiety disorders. [R. 114]. He found that Plaintiff had mild restriction of activities of daily living, moderate difficulty in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration. [R. 115]. Dr. Wise also found that the evidence did not establish the presence of "C" criteria. *Id.* Dr. Wise concluded that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to interact appropriately with the general public, and the ability to respond appropriately to

changes in the work setting. [R. 117-18]. He noted that Plaintiff was not fully credible. [R. 118]. The State disability adjudicator/examiner, Amadiere Zuofa, determined that Plaintiff is not disabled. [R. 120].

On June 8, 2014, Plaintiff's mother completed a Function Report—Adult—Third Party [R. 376-83]. Plaintiff's mother explained that Plaintiff had been sick for the last few years, suffered from severe depression, lost most of her ability to perform even small tasks, gained a lot of weight, and had no desire to participate in social activities. [R. 376]. Plaintiff's mother responded throughout the Function Report that Plaintiff was substantially impacted by her ailments.

Plaintiff presented to Dr. Sahadeo a handful more times in 2014 through July 2014. [R. 520-24]. The doctor's notes are generally illegible, but Dr. Sahadeo did find at each visit that Plaintiff did not suffer from continued psychosis, suicidal or homicidal ideation, or hallucinations. *Id.* Dr. Sahadeo also found that Plaintiff had fair impulse control, fair or dysphoric mood, blunted affect, normal speech, organized thought process, fair insight and judgment, fair or poor eye contact, and fair hygiene. *Id.*

On July 1, 2014, Dr. Sahadeo completed a Medical Source Statement—Mental. [R. 535]. The doctor opined that Plaintiff has marked limitations in her ability to understand, remember and carry out short, simple instructions, to cope with simple, work-related stressors, to make simple work-related decisions and work independently, to ask simple questions and respond appropriately to criticism from supervisors, to get along appropriately with peers, to be aware of normal hazards and take appropriate precautions, and to perform activities of daily living. [R. 536-37]. Dr. Sahadeo also opined that Plaintiff has extreme limitations in her ability to understand, remember, and carry out detailed instructions, to perform activities within a schedule, maintain regular attendance, and be punctual, to sustain ordinary work routine without special supervision, to

11

respond appropriately to changes in the work setting, to maintain social functions, and to maintain concentration, persistence and pace resulting in completion of work-like tasks in a timely manner. *Id.* Dr. Sahadeo found that Plaintiff had suffered from more than three episodes of deterioration or decompensation in a work-like setting. [R. 537]. The doctor noted that Plaintiff was severely depressed and suffered from a panic and anxiety disorder. *Id.* The doctor further noted that Plaintiff had difficulty concentrating and is easily distracted. *Id.* Dr. Sahadeo concluded that Plaintiff was currently unable to seek employment and was disabled. *Id.*

On July 3, 2014, Plaintiff presented to Dr. Tom Coffman. [R. 532]. He diagnosed Plaintiff with inflamed pingueculae. *Id.* Dr. Coffman noted that inflamed pingueculae usually respond to topical lubricants, steroids, and NSAIDs, but that they can be surgically excised if treatment fails. *Id.*

On September 9, 2014, Plaintiff presented to Dr. Carmen Torres complaining of fatigue. [R. 539]. Dr. Torres noted that Plaintiff suffered from fatigue, chronic fibromyalgia, headaches, and joint pain. [R. 541]. Dr. Torres also noted that Plaintiff was not taking her headache medication. *Id.*

On September 18, 2014, Plaintiff presented to Dr. Jeffrey Rubin complaining of three weeks of painful discomfort in the left suboccipital region of her head. [R. 542]. Dr. Rubin explained that Plaintiff's care had been transferred to him from Dr. Zuniga, who Plaintiff had last seen in November 2012. *Id.* Dr. Rubin noted Plaintiff's long history of headaches. *Id.* Dr. Rubin examined Plaintiff and found that she was tender in the region of the greater occipital foramen on the left side, but that she did not suffer from radiating pain. [R. 544]. He diagnosed her with recent onset left occipital neuralgia with coexisting chronic depression and anxiety, as well as chronic tension headaches and periodic migraines without aura. [R. 545]. Dr. Rubin

recommended moist heat applications and a change in medication.  *Id.*

Plaintiff presented to Dr. Sahadeo in October 7, 2014.  [R. 546].  The doctor's notes are generally illegible, but Dr. Sahadeo did find that Plaintiff did not suffer from continued psychosis, suicidal or homicidal ideation, or hallucinations.  *Id.*  Dr. Sahadeo also found that Plaintiff had fair impulse control, fair and dysphoric mood, blunted affect, normal speech, organized thought process, fair insight and judgment, fair eye contact, and fair hygiene.  *Id.*

On March 17, 2015, Plaintiff presented to the JFK Medical Center complaining of shortness of breath and chest pain.  [R. 614].  She was discharged the next day after testing.  [R. 614-15].  Plaintiff was diagnosed with chest pain and shortness of breath, but acute coronary syndrome was ruled out.  [R. 615].

On April 10, 2015, Plaintiff presented to Dr. David Simon.  [R. 593-94].  His notes are illegible, but it appears that he continued Plaintiff's current medications.  *Id.*

Plaintiff saw Dr. Sahadeo five additional times between January and July 2015.  [R. 587-92].  The doctor's notes are generally illegible, but Dr. Sahadeo did find that Plaintiff did not suffer from continued psychosis, suicidal or homicidal ideation, or hallucinations.  *Id.*  Dr. Sahadeo also found that Plaintiff had fair impulse control, fair and dysphoric mood (and one time angry mood), blunted affect, normal speech, organized thought process, fair insight and judgment, fair eye contact, and fair hygiene.  *Id.*  It also appears that Dr. Sahadeo refused to give Plaintiff any more Adderall because she would not submit to a urine sample.  [R. 589].

On July 1, 2015, Dr. Sahadeo completed a Mental Impairment Questionnaire and explained that Plaintiff had been diagnosed with panic disorder, attention-deficit/hyperactivity disorder, and major depressive affective disorder.  [R. 597-601].  Dr. Sahadeo noted that Plaintiff had not required hospitalization or in-patient treatment for her symptoms, but that

Plaintiff's diagnoses and limitations were expected to last at least 12 months. [R. 597]. Dr. Sahadeo found that Plaintiff was not a malingerer. *Id.* The doctor stated that Plaintiff suffered from depressed mood, persistent or generalized anxiety, blunt and flat affect, feelings of guilt or worthlessness, hostility or irritability, suicidal ideation, difficulty thinking or concentration, easy distractibility, flight of ideas, and poor immediate/recent memory. [R. 598]. Dr. Sahadeo also found that Plaintiff experienced episodes of decompensation in a work or work-like setting. [R. 599].

Dr. Sahadeo determined that Plaintiff had marked limitations in the ability to remember locations and work-like procedures, to understand and remember one-to-two step instructions, to understand and remember detailed instructions, to carry out simple, one-to-two step instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule and consistently be punctual, to sustain an ordinary routine without supervision, to work in coordination or near others without being distracted by them, to make simple work-related decisions, to complete a workday without interruptions from psychological symptoms, to perform at a consistent pace without rest periods of unreasonable length or frequency, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them, to maintain socially appropriate behavior, to respond appropriately to workplace changes, to set realistic goals, and to make plans independently. [R. 600]. Dr. Sahadeo found that Plaintiff also had moderate limitations in her ability to act appropriately with the public and to adhere to basic standards of neatness and moderate-to-marked limitations in her ability to ask simple questions or request assistance, to be aware of hazards and take appropriate precautions, and to travel to unfamiliar places or use public transportation. *Id.* Dr. Sahadeo opined that Plaintiff would likely be absent from work due to

14

her impairments for more than three days a month. [R. 601].

Plaintiff presented to Dr. Alejandro Arias, a psychologist, on July 6, 2014, for a psychological evaluation. [R. 608]. Plaintiff reported that she had no energy and was very stressed about her financial circumstances. *Id.* She stated that, on a typical day, she stayed at home, prepared her meals, and talked to her neighbors. [R. 609]. Plaintiff reported panic attacks and stated that a panic attack had led to her hospitalization three months prior. *Id.* Dr. Arias noted that Plaintiff was cooperative and motivated, made a good degree of eye contact, had speech and language skills that were substantive and grammatical, was tearful during the session, reported a depressed mood, denied any suicidal/homicidal ideations, denied hallucinations, and was oriented to time, person, and place. *Id.* Dr. Arias also noted that Plaintiff did poorly on the recent memory test. *Id.* Dr. Arias found that Plaintiff had good persistence, slow pace, and impaired concentration. [R. 610]. The doctor concluded that Plaintiff's performance on the Rey 15-Item Test was within expectancy, and that her results on the Beck Anxiety Inventory and Beck Depression Anxiety—II endorsed severe symptoms of anxiety and depression. *Id.* Dr. Arias found that Plaintiff's prognosis was guarded, that she would benefit from psychiatric treatment and counseling, and that her return to work at that time was guarded. *Id.*

On July 6, 2015, Dr. Arias completed a Mental Health Questionnaire. [R. 602-6]. He noted that he had never treated Plaintiff previously and that this was the first time he had met her. [R. 602]. He diagnosed Plaintiff with major depressive disorder, unspecified. *Id.* Dr. Arias reported that Plaintiff had required hospitalization or inpatient treatment in April 2015. *Id.* He also stated that Plaintiff's diagnosis and limitations were expected to last at least 12 months and that she was not a malingerer. *Id.* The doctor found that Plaintiff suffered from depressed mood, persistent or generalized anxiety, irritable affect, feelings of worthlessness, irritability, suicidal

15

ideation, difficulty thinking or concentrating, easy distractibility, anhedonia/pervasive loss of interests, weight change, decreased energy, social withdrawal or isolation, and decreased need for sleep.[4] [R. 603]. Dr. Arias also found that Plaintiff experienced episodes of decompensation in a work or work-like setting. [R. 604].

Dr. Arias determined that Plaintiff had no marked limitations. [R. 605]. He found that Plaintiff had moderate-to-marked limitations in the ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a workday without interruptions from psychological symptoms, to get along with coworkers or peers without distracting them, to maintain socially appropriate behavior, and to respond appropriately to workplace changes. *Id.* Dr. Arias found that Plaintiff also had moderate limitations in her ability to perform activities within a schedule and consistently be punctual, to work in coordination with or near others without being distracted by them, to perform at a consistent pace without rest periods of unreasonable length or frequency, to interact appropriately with the public, to accept instructions and respond appropriately to criticism from supervisors, and to adhere to basic standards of neatness. *Id.* Finally, Dr. Arias determined that Plaintiff had none-to-mild limitations in her ability to remember locations and work-like procedures, to understand and remember one-to-two step instructions, to carry out simple, one-to-two step instructions, to sustain ordinary routine without supervision, to make simple work-related decisions, to ask simple questions or request assistance, to be aware of hazards and take appropriate precautions, to travel to unfamiliar places or use public transportation, to set realistic goals, and to make plans independently. *Id.* Dr. Arias opined that Plaintiff would likely

---

[4] The way that Dr. Arias filled out the check boxes is very confusing. He put nothing in some boxes, check marks in some boxes, and straight lines in some boxes.

be absent from work due to her impairments for more than three days a month.  [R. 601].

## C.  ALJ Decision

The ALJ issued his decision on Plaintiff's claim for benefits on November 17, 2015.  [R. 36-48].  The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled.  [R. 37-38].  He found that Plaintiff meets the insurance status requirements of the Social Security Act through December 31, 2016, and has not engaged in substantial gainful activity since November 1, 2010, the alleged onset date.  [R. 38].  The ALJ then found that Plaintiff suffers from the following severe impairments: carpal tunnel syndrome of the non-dominant left hand, migraines, obesity, depression, and anxiety.  *Id.*  He specifically noted that Plaintiff's has a non-severe medically determinable impairment in the form of pingueculae and found that the medical record does not indicate that this condition imposes more than minimal restrictions on Plaintiff's ability to perform basic work related tasks.  [R. 37-38].  Finally, the ALJ found that there are no diagnoses from acceptable sources which support Plaintiff's assertions that she suffers from rapid cell growth syndrome or multiple sclerosis and noted that Plaintiff stated at the hearing that she did not actually suffer from multiple sclerosis.  [R. 38].

The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  [R. 39].  The ALJ determined that "there is substantial evidence that the claimant, as an individual with obesity, experiences greater pain and functional limitation than might be expected from her medically determinable impairments individually."  *Id.*  The ALJ also determined that the severity of Plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 and 12.06 as Plaintiff

has mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and no episodes of decompensation of an extended duration. [R. 39-40]. The ALJ also found that the listing 12.04 "paragraph C" criteria had not been met in this case. [R. 40].

The ALJ found that Plaintiff has

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, scaffolds, ramps, or stairs. She is to avoid concentrated exposure to extreme heat, excessive noise, vibration, environmental irritants, and hazards such as dangerous machinery and unprotected heights. She is capable of performing simple, routine tasks, can maintain attention and concentration for simple tasks with customary breaks, and can have occasional or superficial contact with supervisors, co-workers, and the public.

[R. 40-41].

The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. [R. 41]. He then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functions. *Id.* The ALJ first summarized Plaintiff's disability report, pain questionnaire, and function report. *Id.* He then summarized the third party function report completed by Plaintiff's mother. *Id.* The ALJ found that, while Plaintiff's mother's statements were "generally corroborative of Plaintiff's allegations, and have been duly considered, the close relationship between Ms. Valiente and the claimant, and the possibility that the statements were influenced in favor of the claimant by a desire to help the

18

claimant cannot be entirely ignored in deciding how much weight they deserve." *Id.*

The ALJ then summarized Plaintiff's hearing testimony and found that the Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." [R. 41-42]. He went through the various medical records in detail and noted Plaintiff's "sporadic history of routine medical care", her lack of "inpatient hospitalizations for intractable pain", and her lack of "surgery for her purportedly debilitating conditions." [R. 42-43]. The ALJ also noted that Plaintiff has not received massage therapy or botox injections for migraine relief, has not required a prescribed assistive device for ambulation, and has not trialed a TENS unit for pain control. [R. 43]. The ALJ concluded that Plaintiff's "history of sporadic, largely conservative, treatment does not support allegations of disabling conditions." *Id.* The ALJ also found that the objective medical evidence did not support Plaintiff's allegations about the severity of her mental impairments. [R. 43-44]. The ALJ considered the factors enumerated in SSR 96-7p and found that Plaintiff's treatment record does not support her allegations of disabling conditions. [R. 44]. He concluded that Plaintiff's "successful conservative treatment indicates that her symptoms are not as disabling as purported." *Id.*

The ALJ specifically noted that Plaintiff's testimony was "generally not forthcoming at the hearing." [R. 44]. He noted that Plaintiff was able to remain seated for the entire hearing and was able to participate fully without signs of distraction or pain. *Id.* The ALJ stated that his observations were "only one of many factors relied on." *Id.* He also noted that, while Plaintiff described her daily activities as fairly limited, the allegedly limited daily activities could not be

objectively verified, and, even if the daily activities were very limited, it would be "difficult to attribute that degree of limitation to the claimant's medical condition." *Id.* The ALJ also pointed out that, while Plaintiff allegedly was unable to handle simple calculations, she was the representative payee on her child's Supplemental Security Income application of December 2014. *Id.*

The ALJ further noted that Plaintiff's work history fails to support her allegations of disabling conditions in that she received unemployment benefits in 2013 and earned income in 2011. [R. 45]. Finally, the ALJ considered the various inconsistent statements within Plaintiff's medical record and hearing testimony regarding her ability to perform personal care and daily activities. *Id.* He explained that, while Plaintiff may not have intentionally provided inconsistent information, "the inconsistency suggests that the information provided by the claimant generally may not be entirely reliable." [R. 45].

The ALJ next considered the medical opinions. [R. 45]. He gave little weight to the statement of Dr. Sahadeo from July 2014 because it referred to Plaintiff's "global ability to work, which is a determination reserved for the Commissioner." *Id.* The ALJ also gave little weight to the July 2015 statement of Dr. Sahadeo because it diverged from the treatment notes and because it was possible that Dr. Sahadeo was trying to assist Plaintiff because the physician sympathized with her. *Id.*

The ALJ gave Dr. Arias' medical source statement weight "only to the extent that it is consistent with the opinion of Dr. Wise." [R. 45]. The ALJ explained that Dr. Arias submitted a medical source statement on the same day that he first encountered Plaintiff. *Id.* The ALJ then stated that the RFC is based in part upon the opinion of Dr. Wise, the psychological consultant from the Disability Determination Service. [R. 46]. The ALJ gave Dr. Wise's opinion great

weight and found that Dr. Wise's opinion was consistent with Plaintiff's reported symptoms, and allowed for symptom interference. *Id.* Finally, the ALJ did not afford much weight to the opinion of Dr. Krishnamurthy because the medical evidence does, in fact, support and corroborate some of Plaintiff's subjective claims regarding her limitations. *Id.*

The ALJ next found that Plaintiff is unable to perform any past relevant work. [R. 46]. He noted that Plaintiff was 42 years old on the alleged disability onset date. *Id.* The ALJ explained that Plaintiff has at least a high school education and is able to communicate in English. [R. 47]. The ALJ also explained that transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that Plaintiff is "not disabled" whether or not Plaintiff has transferable job skills. *Id.* He concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including price marker, laundry classifier, and mail room clerk. *Id.* The ALJ found that the vocational expert's testimony was consistent with the information found in the DOT. [R. 25]. The ALJ concluded that Plaintiff has not been under a disability since November 1, 2010, through the date of the decision. [R. 48].

## II. MOTIONS FOR SUMMARY JUDGMENT

In her *pro se* Motion for Summary Judgment [DE 24], Plaintiff generally argues that she is very sick and that she does not feel she was "given a fair chance" during her video hearing with the ALJ. Plaintiff also alleges that the ALJ "did not evaluate medical evidence and and [sic] properly consider the opinions" of her treating physicians. *Id.* at pp. 1-2.

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment [DE 25], she contends that the ALJ's

decision is supported by substantial evidence in the record.

### III. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments.

If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518, n. 1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

A. <u>Whether Plaintiff was provided with due process regarding her hearing with the ALJ</u>

Plaintiff seems to argue first that she was not provided with due process because it was difficult to communicate through a video hearing with the ALJ and she was only provided about 20 minutes for the hearing. This argument is summarily dismissed. The Court has reviewed the

23

hearing transcript [R. 56-79], notes that Plaintiff was represented by counsel at the hearing, and finds that Plaintiff was provided with a full and fair hearing. Plaintiff and her counsel were given a full and fair opportunity to present Plaintiff's position at the video hearing before the ALJ. Moreover, Plaintiff had notice ahead of time that the hearing would not be in-person with the ALJ and did not object. *See* R. 187.

B. <u>Whether the ALJ erred by not giving controlling weight to the treating physicians</u>

Plaintiff argues that the ALJ did not give sufficient weight to her treating physicians. The Eleventh Circuit Court of Appeals has explained that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion," but that the ALJ is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 Fed.Appx. 410, 418-419 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis*, 125 F.3d at 1440. "[G]ood cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241. If the ALJ decides to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons for doing so. *Id.*[5]

The ALJ gave little weight to the statement of Dr. Sahadeo from July 2014 because it referred to Plaintiff's "global ability to work, which is a determination reserved for the

---

[5] The Court notes that the law on the deference to give treating physicians has changed, but only for claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1527. Here, Plaintiff's claim was filed prior to March 27, 2017.

24

Commissioner." [R. 45]. The ALJ also gave little weight to the July 2015 statement of Dr. Sahadeo because it diverged from the treatment notes and because it was possible that Dr. Sahadeo was trying to assist Plaintiff because he sympathized with her. *Id.* The ALJ gave Dr. Arias' medical source statement weight "only to the extent that it is consistent with the opinion of Dr. Wise." [R. 45]. The ALJ explained that Dr. Arias submitted a medical source statement on the same day that he first encountered Plaintiff. *Id.* The ALJ then stated that the RFC is based in part upon the opinion of Dr. Wise, the psychological consultant from the Disability Determination Service. [R. 46]. The ALJ gave Dr. Wise's opinion great weight and found that Dr. Wise's opinion was consistent with Plaintiff's reported symptoms, and allowed for symptom interference. *Id.* Finally, the ALJ did not afford much weight to the opinion of Dr. Krishnamurthy because the medical evidence does, in fact, support and corroborate some of Plaintiff's subjective claims regarding her limitations. *Id.*

The Court has reviewed the ALJ's decision and finds that the ALJ stated with particularity the weight he gave to different medical opinions and the reasons why, as required. The ALJ also established good cause for not giving substantial weight to Plaintiff's treating physicians. Finally, the Court notes that the Eleventh Circuit has held that "[t]he treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory." *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991) (citing *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987)). Here, several of the medical questionnaires completed in the record, which consisted almost completely of check marks without any explanation whatsoever, were wholly conclusory.

C. Whether the ALJ findings are supported by the substantial evidence

Plaintiff argues that the ALJ's findings and RFC are not supported by substantial evidence,

while Defendant contends that they are.

An ALJ is required at step two of 20 C.F.R. § 404.1520 to determine whether the claimant's impairment is severe or not severe. "Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected. The claimant's burden at step two is mild. An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work . . . ." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). The Eleventh Circuit Court of Appeals has further explained that, "if no severe impairment is shown [at step two] the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Jamison v. Brown*, 814 F.2d 585, 588 (11th Cir. 1987). As the ALJ continues to steps three, four, and five of the required analysis, the ALJ "is to consider the claimant's entire medical condition, including any impairment or combination of impairments, whether severe or not." *Childers v. Social Sec. Admin., Comm'r*, 521 Fed. Appx. 809, 811 (11th Cir. 2013) (citing *Jamison*, 814 F.2d at 588).

The three-part pain standard requires: "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991). "When evaluating a claimant's subjective symptoms, the ALJ must consider such things as: (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) adverse side-effects of medications; and (5) treatment or measures taken by the

claimant for relief of symptoms." *Rogers v. Berryhill*, No. 16-CV-21906, 2017 WL 5634303, at

\*10 (S.D. Fla. Nov. 6, 2017), report and recommendation adopted sub nom. *Rogers v. Comm'r of*

*Soc. Sec.*, No. 16-21906-CIV, 2017 WL 5598660 (S.D. Fla. Nov. 21, 2017) (quoting *Davis v.*

*Astrue*,     287     Fed.Appx.     748,     760     (11th     Cir.     2008)     (unpublished)

(citing 20 C.F.R. § 404.1529(c)(3)(i)(vi)).

At step two of the required analysis, the ALJ found that Plaintiff suffers from the following

severe impairments: carpal tunnel syndrome of the non-dominant left hand, migraines, obesity,

depression, and anxiety. [R. 38]. He specifically noted that Plaintiff has a non-severe medically

determinable impairment in the form of pingueculae and found that the medical record does not

indicate that this condition imposes more than minimal restrictions on Plaintiff's ability to perform

basic work related tasks. [R. 37-38]. Finally, the ALJ found that there are no diagnoses from

acceptable sources which support Plaintiff's assertions that she suffers from rapid cell growth

syndrome or multiple sclerosis and noted that Plaintiff stated at the hearing that she did not

actually suffer from multiple sclerosis. [R. 38].

The ALJ found that Plaintiff does not have an impairment or combination of impairments

that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404,

Subpart P, Appendix 1. [R. 39]. The ALJ determined that "there is substantial evidence that the

claimant, as an individual with obesity, experiences greater pain and functional limitation than

might be expected from her medically determinable impairments individually." *Id.* The ALJ

also determined that the severity of Plaintiff's mental impairments, considered singly and in

combination, did not meet or medically equal the criteria of listings 12.04 and 12.06 as Plaintiff

has mild restrictions in activities of daily living, moderate difficulties in social functioning,

moderate difficulties with regard to concentration, persistence or pace, and no episodes of

decompensation of an extended duration. [R. 39-40]. The ALJ also found that the listing 12.04 "paragraph C" criteria had not been met in this case. [R. 40].

The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. [R. 41]. He then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functions. *Id.* The ALJ considered Plaintiff's disability report, pain questionnaire, and function report, as well as the third party function report completed by Plaintiff's mother. *Id.*

The ALJ then summarized Plaintiff's hearing testimony and found that the Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." [R. 41-42]. He went through the various medical records in detail and concluded that Plaintiff's "history of sporadic, largely conservative, treatment does not support allegations of disabling conditions." [R. 42-43]. The ALJ also found that the objective medical evidence did not support Plaintiff's allegations about the severity of her mental impairments. [R. 43-44]. The ALJ considered the factors enumerated in SSR 96-7p and found that Plaintiff's treatment record does not support her allegations of disabling conditions. [R. 44]. He concluded that Plaintiff's "successful conservative treatment indicates that her symptoms are not as disabling as purported." *Id.*

The ALJ specifically noted that Plaintiff's testimony was "generally not forthcoming at the hearing." [R. 44]. He further noted that Plaintiff's work history fails to support her allegations of disabling conditions in that she received unemployment benefits in 2013 and earned income in 2011. [R. 45]. Finally, the ALJ considered the various inconsistent statements within Plaintiff's medical record and hearing testimony regarding her ability to perform personal care and daily activities. *Id.* He explained that, while Plaintiff may not have intentionally provided inconsistent information, "the inconsistency suggests that the information provided by the claimant generally may not be entirely reliable." [R. 45].

The ALJ next considered the medical opinions. [R. 45]. He found that Plaintiff is unable to perform any past relevant work. [R. 46]. He noted that Plaintiff was 42 years old on the alleged disability onset date. *Id.* The ALJ explained that Plaintiff has at least a high school education and is able to communicate in English. [R. 47]. The ALJ also explained that transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that Plaintiff is "not disabled" whether or not Plaintiff has transferable job skills. *Id.* He concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including price marker, laundry classifier, and mail room clerk. *Id.* The ALJ found that the vocational expert's testimony was consistent with the information found in the DOT. [R. 25]. The ALJ concluded that Plaintiff has not been under a disability since November 1, 2010, through the date of the decision. [R. 48].

The Court finds that the ALJ properly followed the "pain standard" discussed in *Holt*. As stated in *Holt*: "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so." 921 F.2d at 1223. After a careful review of the record, the Court

finds that the ALJ did articulate several explicit and adequate reasons for discrediting Plaintiff's testimony. This Court cannot reweigh the evidence or substitute its judgment for that of the ALJ.

Furthermore, the Court finds that substantial evidence, which is described in detail above, supports the ALJ's mental and physical RFC and findings. The Court finds that the ALJ clearly considered Plaintiff's entire medical condition in the aggregate in evaluating Plaintiff's RFC and the credibility of Plaintiff's subjective claims. The Court also finds that the vocational findings based on the RFC are supported by the substantial record evidence. The Court concludes that the record contains substantial evidence to support the denial of benefits to Plaintiff and that the correct legal standards have been applied. Accordingly, the ALJ's decision is due to be affirmed.

## IV. CONCLUSION

The Court finds that the record contains substantial evidence to support the denial of benefits to Plaintiff. The Court further finds that the ALJ applied the correct legal standards.

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**. Accordingly, Plaintiff's Motion for Summary Judgment [DE 24] is hereby **DENIED**, and Defendant's Motion for Summary Judgment [DE 25] is hereby **GRANTED**.

Judgment will be entered separately.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this _10_ day of September, 2018.

WILLIAM MATTHEWMAN
United States Magistrate Judge